International Union, U. A. W. A., A. F. of L., Local 232, and others, Respondents, vs. Wisconsin Employment Relations Board and another, Appellants.*

Wisconsin Employment Relations Board, Appellant, vs. International Union, U. A. W. A., A. F. of L., Local 232, and others, Respondents.*

*April 8—June 10, 1947.*

* Motion for rehearing denied, without costs, on September 9, 1947.

554

For the appellant Wisconsin Employment Relations Board there were briefs by the *Attorney General, Stewart G. Honeck,* deputy attorney general, and *Beatrice Lampert,* assistant attorney general, and oral argument by *Mrs. Lampert.*

For the appellant Briggs & Stratton Corporation there was a brief by *Wood, Warner, Tyrrell & Bruce* of Milwaukee, and oral argument by *Jackson M. Bruce.*

For the respondent there was a brief by *Padway, Goldberg & Previant* of Milwaukee, and oral argument by *David Previant.*

FOWLER, J.   The two cases above entitled were argued and submitted together, one brought by the Wisconsin Employment Relations Board against a local union and their officers to enforce an order of the board made upon hearing of a complaint by the Briggs & Stratton Corporation charging the union and their officers with committing an "unfair labor practice;" the other brought by the union and individual defendants against the Wisconsin Employment Relations Board and the corporation to review the order of the board.   Hereinafter the interested parties will be referred to in this opinion as the "union," the "board," the "company," the individual defendants as the "defendants" and the "employees."

Sec. 111.07 (4), Stats., provides that the "final orders" of the board may "require the person complained of to cease and desist from the unfair labor practices found to have been committed."

The final order of the board instantly involved required the defendants to cease and desist from :

"(a) Engaging in any concerted efforts to interfere with production by arbitrarily calling union meetings and inducing work stoppages during regularly scheduled working hours ; or engaging in any other concerted effort to interfere with production of the complainant except by leaving the premises in an orderly manner for the purpose of going on strike.

"(b) Coercing or intimidating employees by threats of violence or other punishment to engage in any activities for the purpose of interfering with production or that will interfere with the legal rights of the employees."

It is to be noted that the last clause of (a) of the board's order forbids concerted effort not only to refrain from the particular things enjoined by the first sentence of (a) but enjoins any concerted effort to interfere with production except to leave the premises for the purpose of going on strike, and this covers doing any one of the things that by the act constitutes an unfair labor practice.

That statute, so far as applicable and material to the instant case, may be stated as follows:

"Sec. 111.06 (2) It shall be an unfair labor practice for an employee individually or in concert with others:

"(a) To coerce or intimidate an employee in the enjoyment of his legal rights; . . . or injure the . . . property of such employee. . . .

"(e) To co-operate in engaging in [or] promoting . . . any . . . overt [act] concomitant of a strike unless a majority in a collective-bargaining unit of the employees of an employer against whom such acts are primarily directed have voted by secret ballot to call a strike." . . .

"(h) . . . to engage in any concerted effort to interfere with production except by leaving the premises in an orderly manner for the purpose of going on strike."

It appears from the findings of fact of the board set out in the statement preceding the opinion that the defendants committed the unfair labor practice proscribed by above pars. (a), (e), and (h).

We will first discuss the unfair labor practice committed under (e). It is to be noted that par. (e) involves co-operation in engaging in overt acts concomitant of a strike. Walking out and refraining from work, and not appearing for work for the purpose of exerting economic pressure are plainly concomitants of a strike, and so doing is an overt act. Co-operation in so doing by plainest implication is prohibited unless the majority of the employees of the collective-bargaining unit by secret ballot have voted to go on strike. There was here no such vote to go on strike. The only vote taken was voiced on the hypothesis and understanding that the act or acts involved was not or were not strikes, and the vote was not by secret ballot. The employees are manifestly guilty of an unfair labor practice under (e). All of the defendants are guilty of an unfair labor practice and are also so whether they walked out or refrained from work or not under sec. 111.06 (3), Stats., be-

cause they "caused to be done" those things. Sec. 111.06 (3) reads:

"Sec. 111.06 (3) It shall be an unfair labor practice for any person to do or cause to be done on behalf of or in the interest of employers or employees, or in connection with or to influence the outcome of any controversy as to employment relations any act prohibited by subsections (1) and (2) of this section."

Taking up the commission of an unfair labor practice under par. (h) of sec. 111.06 (2), Stats., the validity of par. (a) of the order made by the board depends on the meaning of the word "strike" as used therein, and that meaning turns on the meaning of the word as used in the statutes defining unfair labor practices. The word is used in pars. (e) and (h) of sec. 111.06 (2). The respondents claim that leaving the premises as the employees did with intent to resume work at the commencement of their next shift constituted a strike under par. (h) and that consequently the walkouts did not constitute an unfair labor practice, although they and the members of the union unquestionably understood and claimed when the walkouts occurred that they were not a strike. Throughout the controversy between the employer and its employees, the employees and their leaders contended that the activity in which they were engaged did not constitute a strike. It was described by the leaders as a labor weapon designated to avoid a strike and the hardship which a strike imposes on the employees; they claimed it was a better weapon than a strike. The appellants claim that such conduct did not constitute a strike and consequently did constitute an unfair labor practice under par. (h).

It is fundamental that in construing a statute the words therein are to be given the meaning they commonly were understood to have at the time the statute was passed. 59 C. J., Statutes, p. 1137, sec. 673. The meaning of the word "strike" in par. (h) must be construed according to that rule. Ch. 111, Stats., was enacted by ch. 57, Laws of 1939. Before

that time this court had defined the meaning of the word "strike" in a statute relating to labor disputes in *Walter W. Oeflein, Inc., v. State,* 177 Wis. 394, 188 N. W. 633. In that case a statute, sec. 1729*p*—1, Stats. 1919, sec. 103.43, Stats. 1945, prohibited an employer from advertising for help when in fact a strike was in progress without stating in the advertisement the existence of the strike. The defendant was prosecuted for so advertising. The court said in the opinion, p. 399:

"The legislature did not see fit to define the term 'strike' but on the contrary used the term in the sense that it is ordinarily used in connection with labor troubles and as defined by standard authorities upon the subject."

The court at p. 399 quoted Webster's New International Dictionary in defining the word "strike" as "An act of quitting when done by mutual understanding by a body of workmen as a means of enforcing compliance with demands made on their employer" and referred generally to "numerous other definitions of the term 'strike' [that] appear in law dictionaries and decisions, all of which . . . substantially include the elements contained in the definition" quoted from Webster.

In Restatement, 4 Torts, p. 140, sec. 797, it is stated:

". . . it is not a strike if the employees temporarily stop work without making a demand upon the employer or using the stoppage as a means of exacting a concession from him, even if the stoppage is against his will."

This idea is embodied in the *Oeflein Case, supra,* where it is said that to constitute a strike, p. 399:

". . . it first becomes incumbent upon the members or representatives of such unions to make a demand upon the employer in order to lay the basis for a refusal. Such view is in harmony with the fundamental thought underlying the definition of a strike under the common acceptation of the term, and it logically follows that it is contemplated that a strike exists after the demands of the employees are made and refused, as the result of which the employees are withdrawn from the employment."

The phrase above "withdrawn from the employment," implies something more than the temporary quitting with intent to resume commencement of work on the next shift. It implies a continuous withdrawal until the object of the strike is obtained or the strike abandoned.

. As bearing upon the continuation of the stoppage of work being necessary to constitute a strike, sec. 103.43 (1a), Stats., is informative. It was in existence when ch. 111, Stats., was enacted. It reads, so far as here material: ˙

"A strike . . . shall be deemed to exist as long as . . . unemployment on the part of workers affected continues; . . ."

This plainly implies that to constitute a strike there must be a continuance of unemployment. There was no unemployment here; certainly there was no continuance of unemployment.

From the above we think it clearly follows that the employees did not engage in the stoppages of work involved for the purpose of "going on strike" and that the concerted effort to interfere with production constituted an unfair labor practice under par. (h) of sec. 111.06 (2), Stats. The union and the individual defendants caused the walkouts and the refraining from work for the purpose of interfering with production above quoted and under sec. 111.06 (3) they were all guilty of an unfair labor practice whether they in fact were among the employees who did those things or not.

We also think par. (b) of the order of the board is valid because the union and the individual defendants were guilty of an unfair labor practice for coercing and intimidating employees contrary to par. (a) of sec. 111.06 (2), Stats., in the enjoyment of their legal rights. It was certainly a legal right of the employees to continue their work if they wanted to. The injury to property of such employees was undisputably proven even though their names were not determined by the board. The prohibition of the cease-and-desist order operates on the

individual members of the union as well as upon the union's officers, although the individual members are not named as defendants. The union is only an association of its members and whatever is forbidden to the union is forbidden to its members.

The order of the board is criticized because it purports to ban employees from quitting work for the purpose of going to work elsewhere, or with intention of not resuming employment with the instant employer for whatever reason. The order has no such far-reaching effect either upon individuals or upon employees acting in concert. What (a) does, and all that it does, is to ban the individual defendants and the members of the union from "engaging in any concerted efforts" to interfere with production by doing the acts instantly involved. Par. (b) of the order does not use the word "concerted" before the word "activities," and only a few instances appeared in the evidence of employees doing the acts banned by the paragraph. But the defendants manifestly have no right to do the things banned by the paragraph and the order is not void merely because it forbids others from doing what the offending employees did. The same criticism was raised to the order involved in *Wisconsin E. R. Board v. Milk, etc., Union,* 238 Wis. 379, 394, 299 N. W. 31, where it is disposed of by the court saying:

"Besides, if there were only isolated instances of such threats [against customers of employer], no harm results to the union from including the ban in the judgment, as confessedly the union has no right so to threaten."

When nobody is hurt, nobody has cause to cry.

We consider that the above is sufficient to warrant sustaining the validity of the order of the board involved under the terms of the statutes purporting to ban unfair labor practices by employees.

The union contends that if the order is in accordance with the statutes the order is unconstitutional and void so far as it forbids the employees to quit work. The first claim in this

respect is that it imposes involuntary servitude contrary to the Thirteenth amendment to the constitution of the United States. The constitutional point of involuntary servitude here argued was in issue in *Western Union Tel. Co. v. International B. of E. Workers* (D. C.), 2 Fed. (2d) 993. It is said in the opinion in that case, p. 994:

"As to clause 1 of the prayer for a temporary injunction it is said that it prevents employees from ceasing to work, and therefore imposed involuntary servitude upon them. The right to cease work is no more an absolute right than is any other right protected by the constitution. Broadly speaking, of course, one has the right to work for whom he will, to cease work when he wishes, and to be answerable to no one unless he has been guilty of a breach of contract. But the cessation of work may be an affirmative step in an unlawful plan."

When it is such a step in a concerted plan to do an unlawful act it may be enjoined. The quitting and remaining from work in the instant cases was done pursuant to a conspiracy to carry out an unlawful plan. There are many cases to the point that a conspiracy to commit a criminal act may be enjoined. It is too late to contend to the contrary in this state in view of the decision of this court in *State ex rel. Durner v. Huegin,* 110 Wis. 189, 85 N. W. 1046, and its affirmance in *Huegin (Aikens) v. Wisconsin,* 195 U. S. 194, 25 Sup. Ct. 3, 49 L. Ed. 154. As said in *Dorchy v. Kansas,* 272 U. S. 306, 311, 47 Sup. Ct. 86, 71 L. Ed. 248:

"To enforce payment by a strike is clearly coercion. The legislature may make such action punishable criminally. . . . And it may subject to punishment him who uses the power or influence incident to his office in a union to order the strike. Neither the common law, nor the Fourteenth amendment, confers the absolute right to strike. Compare *Aikens [Huegin] v. Wisconsin,* 195 U. S. 194, 204, 205."

The opinion from which the above quotation is taken was written by Mr. Justice BRANDEIS. The act involved in the

case was criminal by statute of Kansas but criminality is not necessary to support injunctional relief. For two or more persons to conspire to do an act to the injury of another which one person acting alone might lawfully do constitutes in this state a legal wrong. *Judevine v. Benzies-Montanye Fuel & Whse. Co.* 222 Wis. 512, 269 N. W. 295. If a conspiracy to do a criminal act may be enjoined so may conspiracy to do an illegal act not criminal. All that is essential to support injunctional relief is unlawfulness. Unfair labor practices are unlawful by our statutes and the board is given the power to forbid such practices. Sec. 111.07 (4), Stats. Its power to make cease-and-desist orders in cases wherein they are authorized by the statute is as soundly established as the power of courts to grant injunctions against criminal conspiracies. While the act involved in the instant case did not involve strikes, certainly if a court or board may prevent strikes by injunctional or cease-and-desist orders, it may issue such orders to prevent the concerted action to cease work here involved. The greater quitting of work involved in strikes includes the lesser quitting here involved.

The respondents also contend that the order involved is unconstitutional because it imposes "previous restraint" upon the right of freedom of speech and freedom of assembly, both protected by the same provision of the constitution, First amendment, that protects freedom of the press. This contention seems to be that as freedom of the press cannot be restrained, neither can one's freedom of speech be restrained by preventing him from saying what he may want in the future to say to induce employees to join the union or to join in its activities, nor can freedom of assembly be restrained by forbidding him in the future from attending union meetings. We do not perceive any such far-reaching effect of the order. The order bans concerted continuance of the acts involved for the unlawful purpose of interfering with production in the situation instantly involved. The union bases this claim on the holding

in *Near v. Minnesota,* 283 U. S. 697, 51 Sup. Ct. 625, 75 L. Ed. 1357. The claim is that as *Near v. Minnesota* protects freedom of the press, it also protects freedom of assembly and freedom of speech. Doubtless it does protect the latter two to the same extent that it protects the former. In *Near v. Minnesota* the publication of a newspaper was enjoined on the ground that its publication of libelous matter constituted a public nuisance and could be abated under a Minnesota statute. Such abatement was held violative of the provision of the clause of the constitution of the United States protecting freedom of the press. That no previous restraint whatever may be imposed is not declared by the decision in that case. It is said, 283 U. S. 697, 715, 51 Sup. Ct. 625, 75 L. Ed. 1367 :

"The objection has also been made that the principle as to immunity from previous restraint is stated too broadly, if every such restraint is deemed to be prohibited. That is undoubtedly true; the protection even as to previous restraints is not absolutely unlimited. . . . the primary requirements of decency may be enforced against obscene publications. The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government. The constitutional guaranty of free speech does not 'protect a man from an injunction against uttering words that may have all the effect of force.' *Gompers v. Buck's Stove & Range Co.* 221 U. S. 418, 439, 55 L. Ed. 797, 805, 34 L. R. A. (N. S.) 874, 31 S. Ct. 492."

It does not follow that speech cannot be restrained unless the restraint is irreconcilable with the free-speech declaration of *Thornhill v. Alabama,* 310 U. S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093. It is stated in the opinion in the *Thornhill Case,* p. 103 :

"It is true that the rights of employers and employees to conduct their economic affairs and compete with others for a share in the products of industry are subject to modifications or qualifications in the interests of the society in which they exist."

We consider that such restraint of speech and assembly as are here involved are within this concession.

It is also urged by the respondents that the order of the board violates the commerce clause of the United States constitution, sec. 8, art. I. This point was decided against them in *Wisconsin Labor R. Board v. Fred Rueping L. Co.* 228 Wis. 473, 279 N. W. 673. That decision was made under a preceding state employment relations act but the decision and the reason of it apply with equal force to the instant act.

The respondents cite *Hill v. Florida,* 325 U. S. 538, 65 Sup. Ct. 1373, 89 L. Ed. 1782, as somehow contrary to our decision in the *Rueping Case, supra.* We do not perceive that it is. The question involved in that case was whether the Florida state law interfered with the right to collective bargaining granted by the National Labor Relations Act. Collective bargaining is not involved in this case. Concededly the union is the bargaining agent of the employees, certified by the National Labor Relations Board, and collective bargaining between the union and the employer was going on during the walkouts. *Alabama State Fed. of Labor v. McAdory,* 325 U. S. 450, 65 Sup. Ct. 1384, 89 L. Ed. 1725, is also cited as contrary to the *Rueping Case.* That decision considers whether the decision of the state court in a declaratory-judgment case declaring a state law regulating labor disputes constitutional would be entertained by the supreme court of the United States and decided that it would not. Every rule laid down in a decision of the United States supreme court as we understand it is to be limited as applying only to the particular facts on which it is based, and no case of that court is called to our attention that involves a situation like that involved herein. More nearly reaching the point here under consideration, perhaps, is *Bethlehem Steel Co. v. New York State Labor Rel. Board,* 330 U. S. 767, 67 Sup. Ct. 1026, 91 L. Ed. 000, the decision of which was not handed down until April 7th last, after the briefs were prepared, and not called to our attention when the case was argued before us on April 11th. But here, as in the *Florida Case, supra,* the point involved was whether the

right of collective bargaining secured by the federal act was limited by the state act involved. Here, as above stated, collective bargaining is not involved but is conceded to be in operation under the terms of the federal act. The point at issue in the *Bethlehem Steel Co. Case, supra,* was, as we understand the decision, whether the State Labor Relations Board could under a state act on petition of foremen in an industrial plant authorize formation of a unit for furthering their mutual interests and for collective bargaining which the National Labor Relations Board under a federal act had declined to authorize. The federal act placed in the National Labor Relations Board the power to determine whether the employees could form such a unit. Administration of the federal act was vested in the National Labor Relations Board. Administration of the state act was in the State Labor Board. Foremen, claiming the right as employees, applied to the National Labor Relations Board to form a unit for collective bargaining. The National Labor Relations Board declined to grant the application. The foremen then applied to the state board to form a unit for such purpose under the state act. This the board proceeded to do. Its action was upheld by the court of appeals and the decision of the court of appeals was reversed by the supreme court of the United States.

The dissenting opinion filed in the supreme court of the United States in the *Bethlehem Steel Co. Case, supra,* took the position that the power delegated to the National Labor Relations Board to form the unit applied for was dormant because the National Labor Relations Board had not exercised it and because the National Labor Relations Board had not exercised the power the state board had jurisdiction to exercise it. The opinion of the court was that the National Labor Relations Board—

" . . . made clear that its refusal to designate foremen's bargaining units was a determination and an exercise of its discretion to determine that such units were not appropriate for

bargaining purposes. [Citing cases.] We cannot, therefore, deal with this as a case where federal power has been delegated but lies dormant and unexercised. . . ."

and the court held that the state board was without jurisdiction. What the court held was that the National Labor Relations Board had exercised the jurisdiction delegated to it under the federal act by declining to designate the foremen as a bargaining unit. The declination was an exercise of its jurisdiction, just as much as granting it would have been. The jurisdiction vested in the National Labor Relations Board was to determine whether it would designate the foremen as a bargaining unit, and it exercised jurisdiction when it denied the application.

No such situation exists in the instant case as was involved in the *Bethlehem Steel Co. Case, supra*. In the first place, no application has been made to the National Labor Relations Board to exercise any jurisdiction of the labor dispute here involved. The National Labor Relations Board not having exercised any jurisdiction of such labor dispute the state board may exercise jurisdiction of it. No conflict is here involved. There was a direct conflict in the *Bethlehem Steel Co. Case*. The National Labor Relations Board had determined that foremen could not form a unit for collective bargaining and the state board said that they could and formed such a unit. The National Labor Relations Board's decision barred the state board from taking any action at all.

In the second place, the Wisconsin Employment Relations Board and the state's "Employment Peace Act" deal with unfair labor practices of employees, a subject not touched by the National Labor Relations Act. Therefore, the Wisconsin Employment Relations Board, in dealing with unfair labor practices of employees, deals with a subject not touched by the National Labor Relations Act or within the jurisdiction of the National Labor Relations Board. There is therefore no conflict between the two acts and can be none between the two

boards, as to the matter instantly involved. It follows that under the rule of the *Rueping Case, supra,* the Wisconsin board had jurisdiction in the instant case. In this all the justices of the supreme court of the United States seem to agree.

Respondents seem to argue that sec. 7 of the National Labor Relations Act, 29 USCA, sec. 157, by providing that "employees shall have the right to self-organization . . . and to engage in concerted activities for the purpose of collective bargaining or other mutual aid and protection," gives to employees the right to engage in the "concerted activities" here involved. Not so. That section does not authorize employees to use concerted activities which are in violation of law. The activities which they are authorized to use in concert are those which are lawful. The activities employed by the respondents in this case were activities which are unlawful under the law of Wisconsin. That only "concerted activities" to secure a lawful objective are protected is held in *Wisconsin E. R. Board v. Milk, etc., Union, supra,* in which *certiorari* was denied by the supreme court of the United States, 316 U. S. 668, 62 Sup. Ct. 1035, 86 L. Ed. 1744, and in *Retail Clerks' Union v. Wisconsin E. R. Board,* 242 Wis. 21, 6 N. W. (2d) 698. The same is in effect held in *Allen-Bradley Local v. Wisconsin E. R. Board,* 315 U. S. 740, 62 Sup. Ct. 820, 86 L. Ed. 1154.

If this is not true how are the states to police the activities of employees as well as employers? If the public interest is to be served there must be co-operation between federal and state governments or the federal government must take over the preservation of peace and good order if it is to effectively protect interstate commerce.

Our so-called "Employment Peace Act" was enacted May 2, 1939, by ch. 57, Laws of that year. It has now been in operation for eight years. So far as we can judge from its doings that have come before us for review it has been administered with reasonable success toward furthering the purpose of the act declared by sec. 111.01 (4), Stats.:

" . . . in order to preserve and promote the interests of the public, the employee and the employer alike, to establish standards of fair conduct in employment relations and to provide a convenient, expeditious and impartial tribunal by which these interests may have their respective rights and obligations adjudicated."

Particularly has the board proved for Wisconsin residents and citizens a comparatively "convenient," "expeditious," and inexpensive tribunal for adjudication of their rights respecting labor practices. If, whenever a minute part of the product of a manufacturer gets into interstate commerce, because there is a federal statute dealing with labor practices of the employers but not dealing with labor practices of employees the commerce clause of the United States constitution nullifies a state act dealing with labor practices of the employees that do not violate any provision of the federal act, then indeed little is left of the sovereignty of the states heretofore supposed to remain with them under amendments IX and X of the United States constitution. We do not mean to suggest that only a minute part of the product of the instant corporation entered into the interstate commerce. But if the contention of the respondents on the ground now under consideration is upheld, then every order of the board based on violation of unfair labor practices of employees may be ignored and there will be nothing left that the board can effectively do, as some products of every manufacturer inevitably reach interstate commerce. We are not yet ready to believe that the congress of the United States, the National Labor Relations Board, or the supreme court of the United States, ever intended to deny, or ever considered that it did deny, power to the state legislature or to the Wisconsin Employment Relations Board the powers exercised by them appearing in the instant case. But however that may be, if the Wisconsin Employment Relations Board is to be in effect abolished by the judgment of a court that judgment will have to be rendered by the supreme court of the United States.

We consider that the above is sufficient to support the validity of the order of the board here involved and to require reversal of the judgment of the circuit court with direction to enter judgments sustaining the orders and for enforcement of them.

*By the Court.*—The judgment of the circuit court is reversed in each case, and the causes are remanded with directions to enter judgments in accordance with this opinion.

The following opinion was filed July 1, 1947:

WICKHEM, J. (*dissenting*). I agree with the conclusion of the majority that the activities in which the union engaged were not a strike because they did not involve cessation of work until such time as the demands of the union were met or the tactic had failed. I further agree for whatever importance it may have that there was no strike vote in satisfaction of the requirements of sec. 111.06 (2) (e), Stats., which provides as follows:

"(2) It shall be an unfair labor practice . . .
"(e) To co-operate in engaging in, promoting or inducing picketing (not constituting an exercise of constitutionally guaranteed free speech), boycotting or any other overt concomitant of a strike unless a majority in a collective-bargaining unit of the employees of an employer against whom such acts are primarily directed have voted by secret ballot to call a strike."

There was no disclosure to the men that the discretion to call meetings was considered or intended to constitute a strike and, indeed, it was the view of the officers at that time that such conduct would not constitute a strike. I think, however, that the section itself is of no materiality because it conditions the concomitants of a strike whereas here we deal with the question whether there was a strike. The only limitation upon the right to strike is that sec. 111.11, Stats., requires ten-day notice of intention to strike where perishable commodities are involved.

My disagreement is with the construction of sec. 111.06 (2) (h), Stats., which makes it an unfair labor practice to take unauthorized possession of the property of an employer or to engage in any concerted effort and interfere with production except by leaving the premises in an orderly fashion for the purpose of going on a strike. I concede that the literal language of the section offers some difficulties but it appears to me that the section is intended to deal solely with acts done upon the premises of the employer. Any other construction makes the prohibition of this section broader than the legislature can reasonably be supposed to have intended to make it. For instance, a concerted and permanent quitting of employment which certainly is not a strike, is prohibited upon this construction. Even a strike initiated by means other than leaving the premises for that very purpose would seem to fall within the condemnation of the section literally construed. So also would every conceivable interference with production, whether by acts on the premises or not. Upon this point it is significant that sections adjacent to sec. 111.06 (2) (h) deal specifically with picketing, boycotting, hindering, or preventing the prosecution of employment, obstructing the entrance to or egress from place of employment, interference with the use of roads, engaging in secondary boycott, sabotage, preventing the obtaining, use, or disposition of materials and other concerted efforts to interfere with production. From this it is a fair conclusion that the scope of sec. 111.06 (2) (h) is much narrower than that ascribed to it by the majority opinion. It was intended to characterize as an unfair labor practice any acts done upon the premises of the employer and tending to interfere with production except that of leaving the premises in an orderly fashion. The fact that the exception is cast in terms of "leaving the premises" fortifies the conclusion that the operative portion of the section deals only with acts done upon the premises. The words in the section "for the purpose of going on strike" offer some difficulty but I think the purpose

was to make a sharp distinction between the sit-down which was popularly called a strike and the sort of activity protected by the act. What the legislature meant was that a strike must be conducted off the premises. Any other construction offers what appears to me as insurmountable difficulties in the instant case. Part of the union's scheme here consisted of refraining from reporting at work and did not, of course, involve even going upon the premises. In order to deal with these facts under the majority view we must take the position either, (1) that concerted failure to report for work is a violation of the section; or (2) that it is so closely related in effect and purpose to leaving the premises that it should be included within the prohibition of the section; or (3) that the scheme of the union must be considered in its entirety and not in separate parts and that failure to report must be considered as an inseparable item of a single unfair labor practice. Any of these views, no matter how plausibly put, in my opinion amounts to a judicial extension of the scope of the section. The Labor Peace Act was passed at a time when sit-down strikes and slow-downs were in vogue and it appears to me that the legislature meant specifically to deal with them and with all other acts done upon the premises of the employer in sec. 111.06 (2) (h), leaving to other sections the definition of other unfair practices amounting to concerted interferences with production. It is clear enough that the scheme involved in the present case was an invasion of the employer's rights of management and control. Such a scheme, however, had never been tried or thought of by unions and evidently was not in the minds of the legislature and perhaps for this reason was not designated an unfair labor practice. In any case, however, I think the section cannot without judicial legislation be broadened to include this as an unfair labor practice.

It has been suggested that sec. 111.06 (3), Stats., has some bearing upon the case. This section provides:

"It shall be an unfair labor practice for any person to do or cause to be done on behalf of or in the interest of employers or

employees, or in connection with or to influence the outcome of any controversy as to employment relations any act prohibited by subsections (1) and (2) of this section."

I am of the view that this section has no application to the present case. It simply imposes upon associations of employers outside unions and other individuals the same duties with respect to fair labor practices as are imposed by subs. (1) and (2) upon those having the relation of employer and employee. In any case, the section requires that before an unfair labor practice can be found the persons referred to do some act specifically prohibited by subs. (1) and (2). That brings us back to our original question and offers no answer that can be of any use in this case.

Since the activity was not a strike I conclude that it is not a protected union activity. It was a breach of shop discipline and an invasion of the employer's rights for which the employer may visit upon the participants the penalty of discharge or lesser disciplines without committing an unfair labor practice under the act.

There is one further matter. It is said that par. (a) of the board's order goes no further than to prohibit the holding of union meetings for the purpose of interfering with production. The order requires the employees to cease and desist from interfering with production "by arbitrarily calling union meetings, inducing work stoppage during regular scheduled working hours; *or engaging in any other concerted effort to interfere with production of the complainant except by leaving the premises in an orderly manner for the purpose of going on strike.*" The italicized portion of the order is in addition to the portion which deals with the matter of union meeetings. As to just what it may prohibit is open to question. It is as broad as the statute itself and appears to me to be more extensive than the acts charged in this case. It seems to me that it should be deleted.

I am authorized to state that Mr. Chief Justice ROSENBERRY and Mr. Justice RECTOR concur in this opinion.