Wisconsin Employment Relations Board, Respondent, vs. Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America, Division 998, and others, Appellants.*

*April 3—May 2, 1950.*

* Motion for rehearing denied, with $25 costs, on June 30, 1950.

44

For the appellants there were briefs by *Padway, Goldberg & Previant* and oral argument by *David Previant,* all of Milwaukee.

For the respondent there were briefs by the *Attorney General, Stewart G. Honeck,* deputy attorney general, and *Beatrice Lampert,* assistant attorney general, and oral argument by *Mrs. Lampert.*

BROADFOOT, J.   The defendants upon appeal assert that the judgment should be reversed because ch. 414, Laws of 1947, now secs. 111.50 to 111.65, inclusive, Stats., is not applicable to these defendants; that it is unconstitutional and void because it is repugnant to sec. 7 of the National Labor Relations Act as amended, and is therefore contrary to sec. 8, art. I, and art. VI of the United States constitution; the

law violates the Fourteenth amendment to the constitution of the United States, and secs. 1, 2, 3, 4, and 9, art. I of the Wisconsin constitution; the judgment and the statute upon which it is purportedly based violate the Thirteenth amendment to the constitution in that they impose involuntary servitude; and further, the judgment is invalid because it is based on ch. 414, Laws of 1947, the several sections of which are unconstitutional and are not severable.

Counsel for the defendants ably advance several persuasive arguments in support of each of their contentions. They might be convincing if the rights of the public in the outcome of this litigation were overlooked. The operations of public utilities have long been subject to scrutiny by regulatory bodies set up by the state to protect the rights of the public. Among the details of their operations subject to regulation are the right to engage in or to discontinue operations, the type and amount of service to be rendered, expansion programs, the type and amount of securities to be issued, rates to be charged, accounting systems, and the amount of depreciation permitted to be charged off. In ordinary commercial enterprises these matters are left to management. On the other hand, utilities are granted certain privileges by law, such as the elimination of most competition and the right of eminent domain. Persons who invest their savings in the securities of a public utility know their capital is subjected to the regulation and control of the state. They must weigh the advantages against the disadvantages in determining in what type of enterprise they will invest. Management and investors alone cannot operate a public utility. There must be natural persons employed to give it life. All are part of one organization which is subject to control by the state. So persons seeking employment must weigh the advantages and disadvantages of employment by public utilities. There are many advantages to this type of employment: There is gen-

erally a continuity of employment in the public-utility field; the state has not been adamant in refusing higher rates when necessary to improve service and working conditions or to bring wages to a standard comparable to wages in other lines of endeavor; the public, too, has been generous in its acceptance of higher rates when they are necessary to pay utility employees suitable wages; utilities may not cease operations nor lock out employees. It is with this in mind that we approach the questions to be determined.

As to the contention that the law does not apply to the defendant employees, the pertinent portions of sec. 111.51, Stats., read as follows:

"111.51 *Definitions.* When used in this subchapter:

"(1) 'Public-utility employer' means any employer (other than the state or any political subdivision thereof) engaged in the business of furnishing water, light, heat, gas, electric power, public passenger transportation or communication, or any one or more of them, to the public in this state. This subchapter does not apply to railroads nor railroad employees.

"(2) 'Essential service' means furnishing water, light, heat, gas, electric power, public passenger transportation or communication, or any one or more of them, to the public in this state."

Webster's New International Dictionary (2d ed., unabridged), distinguishes between railroads and railways as follows:

"*Railroad* . . . is usually limited to roads for heavy steam transportation and also to steam roads partially or wholly electrified or roads for heavy traffic designed originally for electric traction. The lighter electric streetcar lines and the like are usually termed *railways.*"

This is the common and approved usage of the term "railroad" and it is generally so understood when the term is used. The employer is engaged in public passenger transportation and is clearly covered by the act. It is also engaged in

furnishing an essential public service under the definitions contained in the act. The defendants, as employees, are likewise subject to the act.

The second contention, that the law is repugnant to the National Labor Relations Act and is therefore unconstitutional, has been answered in the case of *International Union v. Wisconsin E. R. Board,* 336 U. S. 245, 257, 69 Sup. Ct. 516, 93 L. Ed. 651. The decision in that case was filed after the commencement of this action. It was rendered on an appeal from a decision of this court, 250 Wis. 550, 27 N. W. (2d) 875, 28 N. W. (2d) 254. In that decision, the United States supreme court announced that neither paragraph 7 nor 13 confers upon employees an absolute right to engage in every kind of strike or other concerted activity. The following quotations are from said decision:

"The latter decisions and our own, *Labor Board v. Fansteel Corp.* 306 U. S. 240; *Southern S. S. Co. v. Labor Board,* 316 U. S. 31; *Labor Board v. Sands Mfg. Co.* 306 U. S. 332; *Allen-Bradley Local v. Wisconsin Employment Relations Board,* 315 U. S. 740; and see *Hotel & Restaurant Employees Local v. Wisconsin Employment Relations Board,* 315 U. S. 437, clearly interdict any rule by the board that every type of concerted activity is beyond the reach of the states' adjudicatory machinery. The bare language of sec. 7 cannot be construed to immunize the conduct forbidden by the judgment below and therefore the injunction as construed by the Wisconsin supreme court does not conflict with sec. 7 of the federal act. . . .

"Reliance also is placed upon sec. 13 of the Labor Relations Act, which provided, 'Nothing in this act shall be construed so as to interfere with or impede or diminish in any way the right to strike.' 49 Stat. 449, 457. The 1947 amendment carries the same provision but that act includes a definition. Section 501 (2) says that when used in the act 'The term "strike" includes any strike or other concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective-bargaining agreement) and any

concerted slowdown or other concerted interruption of operations by employees.' 61 Stat. 161.

"This provision, as carried over into the Labor Management Relations Act, does not purport to create, establish, or define the right to strike. On its face it is narrower in scope than sec. 7—the latter would be of little significance if 'strike' is a broader term than 'concerted activity.' Unless we read into sec. 13 words which congress omitted and a sense which congress showed no intention of including, all that this provision does is to declare a rule of interpretation for the act itself which would prevent any use of what originally was a novel piece of legislation to qualify or impede whatever right to strike exists under other laws. It did not purport to modify the body of law as to the legality of strikes as it then existed."

The third contention of the defendants is that the act is in violation of certain constitutional guaranties in that it denies to defendants equal protection of the laws, it deprives the union and its members of their liberties to contract and of their property without due process of law; that it permits involuntary servitude, denies the union and its members the constitutional right of free speech and the right to assemble to consult for the common good, and to petition the government, and that the statute is so vague and indefinite that its application is in violation of due process of law.

The rights guaranteed by both the federal and state constitutions are individual rights, and they are not absolute. In *Carpenters Union v. Ritter's Cafe*, 315 U. S. 722, 725, 62 Sup. Ct. 807, 86 L. Ed. 1143, it was stated:

"Where, as here, claims on behalf of free speech are met with claims on behalf of the authority of the state to impose reasonable regulations for the protection of the community as a whole, the duty of this court is plain. Whenever state action is challenged as a denial of 'liberty,' the question always is whether the state has violated 'the essential attributes of that liberty.' Mr. Chief Justice HUGHES in *Near v. Minnesota*, 283 U. S. 697, 708. While the right of free

speech is embodied in the liberty safeguarded by the due-process clause, that clause postulates the authority of the states to translate into law local policies 'to promote the health, safety, morals, and general welfare of its people. . . . The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise.' Ibid. at 707."

The prohibitions of the statute under review are against the actions of more than one individual when acting in concert. We cannot see that any individual rights are infringed upon. If there is such infringement, it must be recognized that it is in recognition of the paramount rights of the public. The United States supreme court recognized this in the case of *International Union v. Wisconsin E. R. Board, supra,* p. 259, when it stated:

"This court less than a decade earlier had stated that law [National Labor Relations Act] to be that the state constitutionally could prohibit strikes and make a violation criminal. It had unanimously adopted the language of Mr. Justice BRANDEIS that 'Neither the common law, nor the Fourteenth amendment, confers the absolute right to strike.' *Dorchy v. Kansas,* 272 U. S. 306, 311. Dissenting views most favorable to labor in other cases had conceded the right of the state legislature to mark the limits of tolerable industrial conflict in the public interest. *Duplex Co. v. Deering,* 254 U. S. 443, 488. This court has adhered to that view."

Mr. Justice FRANKFURTER also stated this rule in *Carpenters Union v. Ritter's Cafe, supra,* p. 728, as follows:

"We hold that the constitution does not forbid Texas to draw the line which has been drawn here. To hold otherwise would be to transmute vital constitutional liberties into doctrinaire dogma. We must be mindful that 'the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the state to set the limits of permissi-

ble contest open to industrial combatants.' *Thornhill v. Alabama,* 310 U. S. 88, 103."

The contention that the legislation is unconstitutional because it imposes involuntary servitude is answered by the language of the statute itself. Sec. 111.64, Stats., reads as follows:

*"Construction.* (a) Nothing in this subchapter shall be construed to require any individual employee to render labor or service without his consent, or to make illegal the quitting of his labor or service or the withdrawal from his place of employment unless done in concert or agreement with others. No court shall have power to issue any process to compel an individual employee to render labor or service or to remain at his place of employment without his consent. It is the intent of this subchapter only to forbid employees of a public-utility employer to engage in a strike or to engage in a work slowdown or stoppage in concert, and to forbid a public-utility employer to lock out his employees, where such acts would cause an interruption of essential service.

"(b) All laws and parts of laws in conflict herewith are to the extent of such conflict concerning the subject matter dealt with in this subchapter, supplanted by the provisions of this subchapter."

Instead of being subject to involuntary servitude the employees of public utilities enjoy certain advantages, such as continuity of employment, that were mentioned above.

Since we have held in *United G., C. & C. Workers v. Wisconsin E. R. Board,* 255 Wis. 154, 38 N. W. (2d) 692, and do now hold the statute to be constitutional, the final contention of the defendants that the several sections thereof are not severable need not be determined.

*By the Court.*—Judgment affirmed.