FAIRVIEW HOSPITAL ASSOCIATION AND OTHERS v. PUBLIC BUILDING SERVICE AND HOSPITAL AND INSTITUTIONAL EMPLOYEES UNION, LOCAL NO. 113, A. F. L., AND OTHERS.[1]

April 2, 1954.

No. 36,125.

[1]Reported in 64 N. W. (2d) 16.

524

526

*John A. Goldie* and *Samuel I. Sigal*, for appellants.

*C. Donald Peterson* and *Herbert P. Lefler*, for respondents.

*William D. Gunn* and *Donald C. Savelkoul*, for Minnesota State Federation of Labor, *amicus curiae.*

THOMAS GALLAGHER, JUSTICE.

Actions by nine hospitals which come within the definition of charitable hospitals, M. S. A. 179.35, subd. 2, to enjoin defendants, an unincorporated association of workers, hereinafter referred to as "the union," from causing, promoting, or participating in a strike or other work stoppage affecting plaintiffs' employees, pursuant to the union's strike notice filed with the Minnesota labor conciliator April 1, 1953.

The actions, which were consolidated for trial, were brought under the provisions of §§ 179.36 to 179.39, which provide:

§ 179.36. "It is unlawful for any hospital employee or representative of the employee * * * to encourage, participate in, or cause any strike or work stoppage against or directly involving a charitable hospital."

§ 179.37. "It is contrary to public policy and is hereby declared to be unlawful for any charitable hospital to institute, cause, or declare any lockout."

§ 179.38. "In the event of the existence of any labor dispute which cannot be settled by negotiation between the charitable hospital employers and their employees, either such employers or employees may petition and avail themselves of the facilities of the department of labor * * *. If such dispute is not settled within ten days after submission to conciliation, any unsettled issue of *maximum hours of work and minimum hourly wage rates* shall, upon service of written notice by either party upon the other party and the State Labor Conciliator, be submitted to the determination of a board of arbitrators whose determination shall be final and binding upon the parties. * * *" (Italics supplied.)

§ 179.39. "The provisions of Minnesota Statutes 1945, Sections 185.02 to 185.19, shall not apply in the case of a threatened or existing strike or other work stoppage by hospital employees * * *, and such threatened or existing strike or other work stoppage * * * may be enjoined by a court of equity."

Defendants appeared specially in opposition to plaintiffs' motions for temporary injunctions and moved to dismiss the proceedings on the ground that the aforesaid statutory provisions were unconstitutional and void. This motion was denied, and on April 29, 1953, the court enjoined defendants from encouraging, participating in, or causing a work stoppage of plaintiffs' employees *pendente lite*. This is an appeal from such order.

On appeal the union asserts that §§ 179.35 to 179.39 are unconstitutional in that (1) they deny *equal protection* to hospital employees and deprive them of common-law rights *without due process;* (2) they constitute an *unlawful delegation* of legislative power to boards of arbitration without providing *standards for their decisions;* and (3) they are *vague* and *indefinite* and hence not susceptible of judicial construction.

The facts relative to the dispute are as follows: A considerable number of the union's members are employees of the nine hospitals operated by plaintiffs. Identical collective bargaining contracts with them cover certain of their nonprofessional employees. These include nurses aids, orderlies, maids, janitors, elevator operators, laundry workers, cooks, dishwashers, and a number of other classifications. The last of such contracts in effect between the parties expired February 28, 1953. Each contained the following provision:

Art. XI. "This agreement shall be effective as of the date first above written except as otherwise provided herein and shall remain in full force and effect until March 1, 1953, and from year to year thereafter, unless either party shall notify the other party in writing at least sixty (60) days prior to March 1, 1953, or March 1 of any year thereafter, of its intention to change, modify or terminate this agreement."

Each further specified (Article I[f] of the contract, the "maintenance-of-membership" provision) that plaintiffs should give to each new employee a written statement as follows:

"There is a contract between this Hospital and the Public Building Service and Hospital and Institutional Employees Union, Local No. 113, AFL, covering wages, hours, and working conditions. The contract provides that the Union is the sole representative for non-professional employees of the Hospital in the classification of work for which you are hired. The Hospital takes no position as to whether or not you become a member of the Union.

"_____Hospital

"By_____"

On December 17, 1952, the union served notices upon plaintiffs of its intention to reopen the contracts for modifications therein to be effective March 1, 1953. On January 20, 1953, it submitted proposed renewal agreements and requested that prior to March 1, 1953, meetings be held for the purpose of negotiating relative thereto. Thereafter negotiations and conciliation meetings, in part under the auspices of the state labor conciliator, were conducted. They covered proposals relating to *increased wages; hours of work; additional holidays with pay; hospitalization and life insurance benefits; union shop; specific relief intervals during work periods; right of access to hospital by union representative; conditions relative to discharge prior to rate advancements;* and *changes relative to seniority.* The parties failed to reach an agreement with respect thereto. Since March 1, 1953, by mutual consent, they have applied all terms of the expired contract.

On February 27, 1953, plaintiffs submitted to the union a written proposal with respect to the basic issues in dispute as follows:

"1. *Union Shop.* We cannot agree to a Union Shop. Hospitals administer care to the sick without regard to race, creed, color or affiliation, and we are of the unalterable conviction that the hiring or tenure of those who are employed in that ministry should not be based upon any such discrimination. These hospitals, several of them religious institutions, attract and have employees who by

religious conviction will not join a union, so that consent to such compulsory membership provision would render them unemployable.

"The personnel now present in the negotiations settled a strike two years ago in these hospitals by agreement upon the existing provision whereby the hospitals acknowledge in writing to each employee at hiring the existence of this Union as a representative of employees in the classifications covered by the labor contract and disclaim taking any position whether an employee joins or does not join a union. What was considered appropriate and adequate then surely should be so today. Constant pressure for a compulsory membership clause in the contract seems to indicate inability or unwillingness of the Union to promote membership through ordinary persuasion or 'salesmanship'. The hospital under all the circumstances here should not be asked to perform tasks for the union which it apparently admits it cannot do for itself.

"2. *Vacation.* We propose to grant three (3) weeks' vacation after fifteen (15) years of service.

"3. *Hours of work.* We propose to retain the existing hours provisions in Article IV. This provision was mutually adopted after a long history of attempting to accommodate the forty hour work week to the twenty-four-hour-a-day, seven-days-a-week operation of a hospital. Changing it, even by taking from the employees their present Sundays-off advantages, as proposed by the union negotiators, would, we believe, create more of the endless scheduling problems that preceded negotiation of the existing arrangement. As a matter of information, the average hours in hospitals in this region, or nationally on the basis of city-size, hospital-size or among non-profit hospitals, is 43 hours a week. We are under this contract on a 40 hour week.

"4. *Holidays.* Although the standard provisions generally are six holidays, we propose to grant seven (7) holidays, the seventh holiday to be either Good Friday or Easter.

"5. *Sick Leave.* We propose an increase in sick leave benefits, to be one (1) day a month, accumulative to twenty-four (24); unused sick leave may be carried over from year to year but not in excess of the accumulation to twenty-four days.

"6. *Wages.* We propose no wage increase. There is no justification for a wage increase in terms of increase in the cost of living. Using the BLS cost of living indices, Adjusted Series (as the most advantageous for the union), the index for Minneapolis, all items, has been: March 15, 1951—183.2; March 15, 1952, 188.0; and December 15, 1952 (last published figure) 189.7. The wage increase made effective March 1, 1952, more than kept pace with the interim rise in the cost of living. * * *

"7. *Health and Welfare.* The hospitals propose to purchase Blue Cross coverage for the employee, on the nine dollar plan, with the Minnesota Hospital Service Association.

"8. *Arbitration.* The terms and conditions of employment of this contract appear to have good prospect of amicable settlement by collective bargaining. That, not arbitration at a future date, is important. * * * The controversial demand for compulsory membership contract clauses aside, most disputes have naturally involved cost conditions of employment. The former is not the kind of issue which is subject to objective proof as is the latter. The answer to the former inherently stems from the impalpable predisposition of any person named as arbitrator, which is not real arbitration in our judgment. We know of no case where such issue has been submitted to arbitration."

Following some further unsuccessful negotiations, the strike notice of April 1, 1953, was filed. On April 2, 1953, plaintiffs submitted another written proposal wherein it was stated:

"* * * The thought occurs * * * that you may * * * prefer to submit the *cost item* issues to arbitration. We accordingly renew the offer made some weeks ago or submit to *final and binding arbitration* the matters of *hours of work* and *hourly wage rates,* which would cover such proposed changes as your demands relative to a *work week of five consecutive eight hour days, number of days sick leave, number of holidays and vacations, health* and welfare and the matter covered in Article X of your proposed Agreement. This offer has at no time included and does not now include arbitration of your *Union shop demand* or any other condition relating to non-cost

items that might arise *concerning assignment or direction of the working force or otherwise relating to the management obligation safely and efficiently to operate the hospitals.*

"While terms of this offer would otherwise constitute a demand for arbitration under the provisions of Minnesota Statutes Annotated, Section 179.38, we are not making demand for arbitration under the Statute at this time in view of the fact that we do not wish to interfere with your prior demand that the matter be referred to the so called 'Mayor's committee'." (Italics supplied.)

The above offer was rejected, and on April 9, 1953, these actions followed.

While the union does not challenge the legislative authority to enact antistrike legislation in the interest of public health or safety under its police power, it strongly urges that those particular legislative enactments are unconstitutional because, in substance, they prohibit *all* strikes without regard to the issues involved, while requiring binding arbitration as to issues relating *only to maximum hours of work* and *minimum hourly wage rates;* that the right to bargain collectively, which includes as its implement the right to strike, is a common-law remedy of which it cannot be deprived without provision for a complete substitute method or remedy for determining all issues which are the subject of collective bargaining; and that failure here to provide such substitute constitutes a denial of due process and of equality of protection with plaintiffs. As stated in the union's briefs:

"* * * The primary fault with this law lies not in the fact of its ban on strikes, but rather in its ban on strikes *without constitutionally safeguarding the rights of hospital employees so as to afford them a real and adequate substitute remedy of arbitration for all disputes upon all unsettled issues that might lead to a strike."* (Italics supplied.)

"* * * It is * * * the inequality and discrimination * * * between *hospital employers* on one hand, and *hospital employees* on the other hand, to which we object." (Italics supplied.)

■ The early concept of a strike as an unlawful conspiracy[2] has long since given way to its acceptance as a fundamental common-law right of labor in its efforts to better its economic position and to obtain a fair share of the industrial profits it is instrumental in creating. The right of labor to organize and to utilize its organizations through strikes for its further advancement has long been regarded as its exercise of common-law rights. Gray v. Building Trades Council, 91 Minn. 171, 97 N. W. 663, 63 L. R. A. 753; Bohn Mfg. Co. v. Hollis, 54 Minn. 223, 55 N. W. 1119, 21 L. R. A. 337; Pickett v. Walsh, 192 Mass. 572, 78 N. E. 753, 6 L.R.A.(N.S.) 1067; Simon v. Schwachman, 301 Mass. 573, 18 N. E. (2d) 1. As this court said in the Gray case (91 Minn. 182, 97 N. W. 667):

"* * * A person's occupation or calling, by means of which he earns a livelihood and endeavors to better his condition, and to provide for and support himself and those dependent upon him, is property within the meaning of the law, and entitled to protection as such; and as conducted by the merchant, by the capitalist, by the contractor or laborer, is, aside from the goods, chattels, money, or effects employed and used in connection therewith, property in every sense of the word. Labor may organize, as capital does, for its own protection and to further the interests of the laboring class."

It is clear from the foregoing that legislation which prohibits strikes constitutes an interference with certain fundamental rights of labor, in particular its right to sell its services to its best advantage, as well as its liberty to contract, and hence constitutes a "taking" of property within U. S. Const. Amend. XIV, for which the requirements of due process must be met. Adkins v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 67 L. ed. 785; Coppage v. Kansas, 236 U. S. 1, 35 S. Ct. 240, 59 L. ed. 441; Adair v. United States, 208 U. S. 161, 28 S. Ct. 277, 52 L. ed. 436. The crucial question here is whether the legislature, in modifying the collective bargaining relationship governing the parties to these proceedings and thereby

---

[2]Motion Picture, etc. Union v. Rialto Theatre Co. 25 Del. Ch. 347, 17 A. (2d) 836; Farmers' Loan & Trust Co. v. N. P. R. Co. (C. C. E. D. Wis.) 60 F. 803, 25 L. R. A. 414.

534

taking from defendants the common-law property rights above described, has acted within the proper concepts of due process.

■ Defendants concede, and the laws appear settled, that there are situations when, in the interest of public health, safety, and welfare, the legislature, acting under its police power, may prohibit strikes in certain fields of endeavor. The validity of legislative action along this line is illustrated by such cases as N. J. Bell Tel. Co. v. Communications Workers, 5 N. J. 354, 75 A. (2d) 721; State v. Traffic Tel. Workers Fed. 142 N. J. Eq. 785, 61 A. (2d) 570; Wisconsin Employ. Rel. Board v. Amalgamated Assn. 257 Wis. 43, 42 N. W. (2d) 471 (reversed on other grounds, 340 U. S. 383, 71 S. Ct. 359, 95 L. ed. 364), involving public utilities. See, also, State v. Traffic Tel. Workers' Fed. 2 N. J. 335, 66 A. (2d) 616, 9 A. L. R. (2d) 854; Local 170 v. Circuit Judge, 322 Mich. 332, 34 N. W. (2d) 71. These principles were expressed by the United States Supreme Court in International Union v. Wisconsin Employ. Rel. Board, 336 U. S. 245, 259, 69 S. Ct. 516, 524, 93 L. ed. 651, 665, where it stated:

"* * * This Court * * * had stated that law to be that the state constitutionally could prohibit strikes * * *. The right to strike, because of its * * * impact upon the public interest, is more vulnerable to regulation than the right to organize and select representatives for lawful purposes of collective bargaining which this Court has characterized as a 'fundamental right' and which, as the Court has pointed out, was recognized as such in its decisions long before it was given protection by the National Labor Relations Act. Labor Board v. Jones & Laughlin, 301 U. S. 1, 33."

■ The National Labor Relations Act,[3] aside from the fact that employees of charitable hospitals are exempt from its terms,[4] did

[3] 49 Stat. 449, 29 USCA, § 151, *et seq.*, as amended by 61 Stat. 136, 29 USCA, § 141, *et seq.*

[4] Charitable hospitals are specifically excluded from the terms of the National Labor Relations Act by 61 Stat. 137, 29 USCA, § 152(2) thereof, which provides:

"The term 'employer' * * * shall not include * * * any corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual, * * *."

not operate to nullify this regulatory power of the states with respect to strikes in which the public interest or welfare was involved, except in those fields of endeavor pre-empted by federal regulations.[5]

As stated in International Union v. Wisconsin Employ. Rel. Board, 336 U. S. 245, 258, 263, 69 S. Ct. 516, 524, 526, 93 L. ed. 651, 665, 668:

"This provision [§ 13] * * * did not purport to modify the body of law as to the legality of strikes as it then existed. * * *

* * * * *

"* * * What other Acts or other state laws might do is not attempted to be regulated by this section. * * * it can have no effect on the right of the State to resort to its own reserved power over coercive conduct as it has done in this instance."

See, also, State v. Traffic Tel. Workers Fed. 142 N. J. Eq. 785, 61 A. (2d) 570 (reversed on other grounds, 2 N. J. 335, 66 A. [2d] 616); Wisconsin Employ. Rel. Board v. Amalgamated Assn. 257 Wis. 43, 42 N. W. (2d) 471.

Our decision in N. W. Hospital v. Public Building S. E. Union, 208 Minn. 389, 294 N. W. 215, held employees of charitable hospitals were not excluded from the provisions of the Minnesota Labor Relations Act, M. S. A. c. 179, patterned after the National Labor Relations Act. The subsequent enactment of the charitable hospitals act (§§ 179.35 to 179.39) here involved modified the status of such employees only to the extent of placing a legislative restriction upon their right to strike and compelling arbitration of certain of the issues in dispute in lieu thereof.

As indicated in Gray v. Building Trades Council, 91 Minn. 171, 182, 97 N. W. 663, 667, 63 L. R. A. 753, the right of labor to enforce its demands through strike is a common-law right or remedy, a workman's means of protecting his occupation—"*property* within the meaning of the law, and entitled to protection as such" which "can be taken away only by the law of the land, * * * by lawful regu-

---

[5]Amalgamated Assn. v. Wisconsin Employ. Rel. Board, 340 U. S. 383, 71 S. Ct. 359, 95 L. ed. 364.

lations adopted as necessary for the * * * public welfare." (Italics supplied.)

While up to the present cases determining the validity of legislation prohibiting strikes enacted under the police power have not expressly passed upon the need of provisos for substitute remedies therefor[6] as requisites to the constitutionality thereof (Chas. Wolff Packing Co. v. Industrial Court, 262 U. S. 522, 43 S. Ct. 630, 67 L. ed. 1103; Dorchy v. Kansas, 272 U. S. 306, 47 S. Ct. 86, 71 L. ed. 248; State v. Traffic Tel. Workers Fed. 142 N. J. Eq. 785, 61 A. [2d] 570 [reversed on other grounds, 2 N. J. 335, 66 A. (2d) 616]; N. J. Bell Tel. Co. v. Communications Workers, 5 N. J. 354, 75 A. [2d] 721; Local 170 v. Circuit Judge, 322 Mich. 332, 34 N. W. [2d] 71; Wis-

[6]A number of states have enacted legislation prohibiting strikes in public utilities. In some of such enactments, arbitration, not always compulsory, was provided for as a substitute for the prohibited right to strike.

In New Jersey (N. J. Stat. Ann. [Perm. ed.] § 34:13B–1, et seq.) the prohibition against strikes and lockouts is accompanied by a provision absolutely requiring that arbitration be conducted. The Nebraska law (Rev. Stat. of Neb. 1943, § 48–801, et seq.), while banning strikes and lockouts, makes no provision for arbitration but does provide that, if either party so petitions the industrial court, a hearing and binding decision must follow.

In the remaining states, while the absolute bar against striking exists prior to the time compulsory arbitration is required, there is no positive declaration that such arbitration need be held at all. The usual procedure in Massachusetts (Ann. Laws of Mass. c. 150B), Indiana (Burns Ind. Stat. Ann. § 40–2401, et seq.), Pennsylvania (43 Purdon's Penn. Stat. Ann. [Perm. ed.] § 213.1, et seq.), Florida (Fla. Stat. c. 453), and Wisconsin (Wis. Stat. § 11.50, et seq.) is that strikes are made unlawful and arbitration will be compelled only if the governor, state labor board, or a mediator believes the dispute cannot be otherwise resolved and is likely to cause community hardship and in his or their discretion calls the parties to submit to arbitration.

Missouri (Vernon's Ann. Mo. Stat. § 295.010, et seq.) and Virginia (Va. Code, § 40–95.1, et seq.) make no provision for compulsory arbitration following their prohibitions against strikes.

Kansas (Gen. Stat. of Kan. Ann. § 44–601, et seq.) does not compel arbitration, and only if the state labor commissioner believes the continuity or efficiency of services is endangered and in his discretion compels a hearing will any binding determination on the matter issue.

consin Employ. Rel. Board v. Amalgamated Assn. 257 Wis. 43, 42 N. W. [2d] 471 [reversed on other grounds, 340 U. S. 383, 71 S. Ct. 359, 95 L. ed. 364]), a survey of federal and state decisions clearly manifests that there are definite limitations upon legislative enactments made pursuant to the police power which abridge or abrogate common-law rights or remedies generally. This principle was first given expression here in Allen v. Pioneer-Press Co. 40 Minn. 117, 122, 41 N. W. 936, 938, 3 L. R. A. 532, as follows:

"The guaranty of a certain remedy in the laws for all injuries to person, property, or character, * * * inserted in our bill of rights, * * * are but declaratory of general fundamental principles, founded in natural right and justice, and which would be equally the law of the land if not incorporated in the constitution. *There is unquestionably a limit in these matters, beyond which if the legislature should go, the courts could and would declare their action invalid.*" (Italics supplied.)

The United States Supreme Court enunciated that doctrine in Truax v. Corrigan, 257 U. S. 312, 329, 42 S. Ct. 124, 128, 66 L. ed. 254, 261, as follows:

"It is argued that, while the right to conduct a lawful business is property, the conditions surrounding that business, such as regulations of the State for maintaining peace, good order, and protection against disorder, are matters in which no person has a vested right. * * * It is true that no one has a vested right in any particular rule of the common law, but it is also true that the legislative power of a State can only be exerted in subordination to the fundamental principles of right and justice which the guaranty of due process in the Fourteenth Amendment is intended to preserve, and that *a purely arbitrary or capricious exercise of that power whereby a wrongful and highly injurious invasion of property rights, as here, is practically sanctioned and the owner stripped of all real remedy, is wholly at variance with those principles.*

"*"* * * To give operation to a statute whereby serious losses inflicted by such unlawful means are in effect made remediless, is, we think, to disregard fundamental rights of liberty and property*

*and to deprive the person suffering the loss of due process of law."* (Italics supplied.)

These decisions clearly frame the concept that, if the right to strike in certain enterprises directly affecting the public welfare may be prohibited by legislative enactment, some adequate substitute remedy must be provided for the right thus withdrawn if the enactment is to meet the requirements of due process.

■ To ascertain the requirements governing provisions for substitute remedies when fundamental rights or remedies are withdrawn by legislative enactments under the police power, consideration may be given to the decision of state and federal courts wherein applicable tests therefor are defined. Decisions construing workmen's compensation enactments, which in effect withdrew the right of employees to common-law actions based upon negligence, and substituted therefor remedies in which the amount of recovery was limited but in which proof of negligence and like issues was no longer required, shed substantial light on the subject. In effect, they hold that the substitute remedy may differ from the right withdrawn if it meets the reasonable demands of the occasion and the legislature did not act unreasonably or arbitrarily in providing it. As stated in Arizona Employers' Liability Cases, 250 U. S. 400, 427, 39 S. Ct. 553, 558, 63 L. ed. 1058, 1069:

"* * * We cannot * * * regard this statute as anything else than a substitute for the law as it previously stood; *whether it be a proper substitute was for the people of the State of Arizona to determine; but we find no ground for declaring that they have acted so arbitrarily, unreasonably, and unjustly as to render their action void."* (Italics supplied.)

See, also, Middleton v. Texas Power & Light Co. 249 U. S. 152, 39 S. Ct. 227, 63 L. ed. 527. These principles were expressed by this court in Breimhorst v. Beckman, 227 Minn. 409, 430, 35 N. W. (2d) 719, 732, as follows:

"* * * The objective of its [police power] exercise is the preservation of the public welfare, * * * and the remedy adopted there-

under must be *reasonably* designed to accomplish its purpose without going beyond the *reasonable* demands of the occasion. A wide discretion is vested in the legislature in determining when a public welfare need exists and in the selection of an appropriate remedy. * * *

\* \* \* \* \*

"It is unnecessary to dwell in detail upon the varied needs and problems arising out of modern employment which justify the application of the police power, since they are too obvious and have already been ably set forth by others who have also pointed out that workmen's compensation acts similar to that of Minnesota *provide an adequate and reasonable remedy."* (Italics supplied.)

To be gathered from the foregoing is the principle that, in withdrawing or nullifying fundamental or common-law rights or remedies such as the right to strike, a legislature under its police power may not act *arbitrarily or unjustly* and ordinarily should provide a *substantial and reasonable* substitute for the rights withdrawn.

■ Provision for compulsory arbitration of substantial issues appears, by implication at least, to be judicially regarded as not such an unreasonable substitute for the right to strike withdrawn under the police power of a state as to require judicial annulment of the enactment. This is manifested in the expressions of Mr. Justice Frankfurter, one of the three dissenting justices in Amalgamated Assn. v. Wisconsin Employ. Rel. Board, 340 U. S. 383, 409, 71 S. Ct. 359, 373, 95 L. ed. 364, 383, where, in touching upon an issue which did not govern the majority opinion, he stated:

"Whether the State chose wisely in adopting *arbitration rather than taking no measure or taking a more forceful measure to protect the public interest is not for us to decide.* \* \* \* If there is legislative choice it is not for us to demand that what is chosen should commend itself to our private notions of wise policy." (Italics supplied.)

See, Wisconsin Employ. Rel. Board v. Amalgmated Assn. 257 Wis. 43, 42 N. W. (2d) 471 (reversed on other grounds, 340 U. S. 383, 71 S. Ct. 359, 95 L. ed. 364) ; State v. Traffic Tel. Workers Fed. 142

N. J. Eq. 785, 61 A. (2d) 570 (reversed on other grounds, 2 N. J. 335, 66 A. [2d] 616); N. J. Bell Tel. Co. v. Communciations Workers, 5 N. J. 354, 75 A. (2d) 721. See, also, 33 Minn. L. Rev. 314; 35 Minn. L. Rev. 669; 49 Col. L. Rev. 661; 38 Harv. L. Rev. 753, 792; 33 Iowa L. Rev. 609, 617, 618.

Defendants concede that compulsory arbitration, if extended to all issues, would constitute an adequate substitute, but complain that the present enactment, limiting such arbitration to "maximum hours of work" and "minimum hourly wage rates," does not cover *all* issues in dispute and is therefore insufficient to give validity to the enactment.

■ At the outset it may be well to state that we are strictly limited in our consideration of legislative actions of this kind. As stated in Allen v. Pioneer-Press Co. 40 Minn. 117, 122, 41 N. W. 936, 938:

"* * * There is * * * a limit * * * beyond which if the legislature should go, the courts could and would declare their action invalid. *But inside of that limit there is, and necessarily must be, a wide range left to the judgment and discretion of the legislature, and within which the courts cannot set up their judgment against that of the legislative branch of the government.* * * *

"* * * what constitutes 'an adequate remedy' or 'a certain remedy' is not determined by any inflexible rule found in the constitution, but is subject to variation and modification, as the state of society changes. Hence *a wide latitude must, of necessity, be given to the legislature in determining both the form and the measure of the remedy for a wrong.*" (Italics supplied.)

We are powerless to upset a law if it has a reasonable relationship to the legislative purpose in its enactment. The legislature is primarily the judge of the need therefor, and we cannot override its judgment unless it has been exercised in an arbitrary and discriminatory manner contrary to the requirements of due process. Every presumption favors the validity of its enactments, and even though, in our judgment, an enactment may be deemed unwise, this in itself

furnishes no basis for our annulment thereof. Lee v. Delmont, 228 Minn. 101, 36 N. W. (2d) 530.

■ It is not disputed that the operation of a charitable hospital constitutes an endeavor in a field of enterprise in which the public has a direct and vital interest, distinct from almost any other type of business. Legislative enactments relating to the continued and safe operation of such institutions must be considered in the light of this fact—a basis which gives such enactments a status quite distinct from those similarly affecting other industries involving public interest.

■ Provision for compulsory arbitration of "maximum hours of work" and "minimum hourly wage rates" considered broadly, as plaintiffs suggest in their offer to arbitrate, would seem to cover matters relating to daily hours of work; work days per week; days of sick leave; holidays and vacation days; health and welfare matters; and numerous other issues bearing most directly upon defendants' welfare. It is equally clear that such arbitration would not extend to issues relating to *union shop* or *union security* or those involving questions of *internal management* and like obligations which rest squarely upon plaintiffs for the safe and efficient operation of their hospitals.

■ Exclusion of the union shop issue may have been prompted by legislative knowledge that much of the work in these institutions is performed by members of religious and charitable organizations or others not concerned with the monetary remuneration for their labors but whose only desire is to serve faithfully and humbly because of the charitable, humanitarian, or spiritual aspects involved; that many of them consider themselves ineligible for union membership because of religious beliefs or otherwise; and that were it not for their services many of such hospitals might not surmount their financial difficulties, to the public loss. Such factors may have induced the legislative conclusion that to compel arbitration of an issue, the end result of which might be to require such employees to terminate their employment because of ineligibility for union membership, was unjust and contrary to public interest, and that,

hence, arbitration relative thereto should not be included in the substitute provided for the rights withdrawn.

■ With reference to questions of internal management, it is not unreasonable to believe that the legislature may have been prompted to exclude from arbitration issues relative thereto because of its knowledge that hospital management may often bear directly upon the life or death of patients therein; and that the assignment and direction of employees was too vital a matter to be entrusted to anyone but the skilled medical technicians and staff members of such hospitals. In the light of such legislative knowledge, and under principles which forbid the substitution of our judgment for that of the legislature as to the wisdom of such enactments, we cannot say that the arbitration provided for was the result of such an arbitrary, capricious, and unreasonable action on the part of the legislature, or was so inadequate, unreasonable, and lacking in substance as an alternative to the right to strike that the entire act should be invalidated as violative of due process.

■ Defendants assert that §§ 179.37 and 179.38 deny equal protection to employees as against employers of charitable hospitals. They contend that thereunder employers are left with substantially the same bargaining power they possessed prior to the enactment thereof, while employees have been severely curtailed through the denial of their right to strike.

The enactment denies employers the right to direct a lockout on the one hand and the employees the right to strike on the other. It is clear that the prohibition of these rights seriously weakens the bargaining power of both parties. As a substitution for this loss, the arbitration board, with authority to finally decide most of the issues in dispute, may be invoked by either party. As a result of this legislation, an employer cannot lower wages or increase work hours except through negotiation or arbitration. Specifically, an employer could not lock out any employees because of their refusal to meet demands in this respect. Should the employer arbitrarily lessen wages or increase hours of work following expiration of the contract between the parties, there is nothing to compel the employees to continue employment at the reduced wage scale or in

accordance with the increased work schedule. Should the employer remain passive upon expiration of the contract in the face of employees' demands for increased wages or hour changes, the latter may invoke the arbitration board to determine the issue.

While it is true that the employees cannot compel arbitration of the union shop issue or questions relative to internal management, by the same token the employers could not compel arbitration of a demand that the "maintenance of membership conditions," set forth in the contract, be discontinued, or failing to secure an agreement to such effect, lock out the employees because thereof. It is clear that within the legislative concept the enactment, with the limitations as above set forth, acted equally on the employer and the employees by denying each certain rights theretofore possessed and granting to each substitute rights in lieu thereof. See, 49 Col. L. Rev. 661.

We cannot pass on the soundness of social or economic theories in the legislative mind when statutes of this kind are enacted in the exercise of police power. We cannot substitute our judgment or opinions for those of the legislature as to the expediency thereof. Before we can invalidate such legislation under the equal protection clause, it must be shown that the legislature has arbitrarily and unreasonably discriminated against certain individuals and favored others in connection therewith. 3 Dunnell, Dig. (3 ed.) § 1605. The fact that present economic conditions may result in one of the two contestants being favored by the legislation for the time being does not afford a sound basis for nullifying it when it is not beyond the range of possibilities that future economic changes may tip the scales in favor of the other contestant at some later date.

The equal protection clause does not demand that laws operate with rigid sameness upon all persons within a state (Stebbins v. Riley, 268 U. S. 137, 45 S. Ct. 424, 69 L. ed. 884), and a law need not affect every man, woman, and child exactly alike in order to avoid constitutional prohibition against inequality. Kempien v. County of Ramsey, 160 Minn. 69, 199 N. W. 442; Sammarco v. Boysa, 193 Wis. 642, 215 N. W. 446, 55 A. L. R. 370. Exact wisdom and mathematical nicety in the adaptation of remedies is not required. Chicago Dock & Canal Co. v. Fraley, 228 U. S. 680, 33 S. Ct. 715,

57 L. ed. 1022. Under these principles it has been held that enactments authorizing workmen to adopt a label to be used on goods prepared by its members;[7] or which require employers advertising for workers during a strike to mention its existence;[8] or which except members of union organizations from the operation of a statute prohibiting combinations to prevent competition,[9] though favoring the union worker, are not violative of the equal protection clause.

In Joyce v. G. N. Ry. Co. 100 Minn. 225, 231, 110 N. W. 975, 978, 8 L.R.A.(N.S.) 756, where this court upheld the statute which made it unlawful for two or more employers to combine or confer together for the purpose of preventing or interfering with any person from procuring employment by threats, promises, or black lists, we stated:

"* * * strife * * * between employers and employees respecting the rights and obligations of each to the other has brought from the legislatures of many * * * states numerous enactments for * * * ameliorating the condition of the employee on the one hand and protecting the property and property rights of the employer on the other. These courts have sustained on the broad ground that every citizen is entitled to the equal protection of the law, and that it is a legitimate exercise of legislative power to prescribe rules defining and establishing distinctions respecting the rights, obligations, and duties of employers and employees as a class."

With these limitations in mind, we conclude that the legislative basis for the limitations upon the rights of employers and employees embodied in §§ 179.36 to 179.38 are not so unjust, unequal, or discriminatory at the employees' expense as to authorize this court to annul their enactment.

■ It is contended that § 179.38 constitutes a delegation of legislative authority without the establishment of sufficient standards for the guidance of the arbitrators provided for therein and that it

---

[7]Cohn v. People, 149 Ill. 486, 37 N. E. 60, 23 L. R. A. 821, 41 A. S. R. 304.

[8]Commonwealth v. Libbey, 216 Mass. 356, 103 N. E. 923, 49 L.R.A.(N.S.) 879.

[9]Cleland v. Anderson, 66 Neb. 252, 92 N. W. 306, 96 N. W. 212, 98 N. W. 1075, 5 L.R.A.(N.S.) 136.

is so vague and indefinite as to be incapable of judicial construction. The present controversy does not involve the validity of an award under § 179.38. Other enactments, wherein the term "minimum wages" without further definition thereof has been employed, have met the test of constitutionality. Williams v. Evans, 139 Minn. 32, 165 N. W. 495, 166 N. W. 504, L. R. A. 1918F, 542. The National Labor Relations Act does not define either wages or hours to a more specific degree than § 179.38, and has never been challenged on this ground.

The Minnesota charitable hospitals act, §§ 179.35 to 179.39, inclusive, is part of c. 179, designated as the Minnesota Labor Relations Act. While §§ 179.35 to 179.39 limited some of the rights of charitable hospital employees, including their right to strike, thereunder they were not otherwise withdrawn from the terms of the act. Section 179.38 authorizes either employers or employees of such institutions to petition and avail themselves of the facilities of the department of labor as provided in §§ 179.01 to 179.17, insofar as consistent with §§ 179.35 to 179.39. It provides that the board of arbitrators selected thereunder shall have the powers possessed by commissioners under § 179.08. This would authorize it to issue subpoenas requiring attendance of witnesses or the production of evidence; to administer oaths; and to hear testimony. Thereunder parties affected by disputes are authorized to appear in person or by representative to be heard on the issues involved. When conciliation fails thereunder, § 179.09 provides that the controversy may be submitted to arbitration under §§ 572.01 to 572.07 or under the rules of the American arbitration association. We have held that arbitrators under § 572.03 act in a quasi-judicial capacity[10] and are expected to determine issues according to equity and good conscience so that justice between the parties will be achieved.[11]

---

[10]Park Const. Co. v. Independent School Dist. 216 Minn. 27, 11 N. W. (2d) 649; McQuaid Market House Co. v. Home Ins. Co. 147 Minn. 254, 180 N. W. 97.

[11]Park Const. Co. v. Independent School Dist. *supra.*

Section 179.40 sets forth that the public policy of the state with reference to labor relations is:

"To protect and promote the interests of the public, employees and employers alike, * * *;

"To promote industrial peace, regular and adequate income for employees, and uninterrupted production of goods and services; and

"To reduce the serious menace to the health, morals and welfare of the people of this state arising from economic insecurity due to stoppages and interruptions of business and employment."

It would seem clear that within the framework of the foregoing statutes there can be found the rules for conducting arbitration under § 179.38 and guides for the just and equitable determination of issues presented thereunder. As stated in N. J. Bell Tel. Co. v. Communications Workers, 5 N. J. 354, 370, 75 A. (2d) 721, 729:[12]

"* * * It is * * * requisite that the delegation of legislative power prescribe the standards that are to govern the administrative agency in the exercise of such delegated power, but 'it is only necessary that the statute establish *a sufficient basic standard—a definite*

---

[12]New Jersey Stat. Ann. (Perm. ed.) § 34:13B–27(b), as amended by L. 1949, c. 308, provides:

"* * * the board shall make a just and reasonable determination of the dispute, and * * * base its findings * * *, decision and order upon the following factors:

"(1) The interests and welfare of the public.

"(2) Comparison of the wages, hours and conditions of employment of the employees involved * * * doing the same, similar or comparable work * * *.

"(3) Comparison of wages, hours and conditions of employment * * * in industries in general and in public utilities in particular * * *.

"(4) The security and tenure of employment * * *.

"(5) Such other factors not confined to the foregoing which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, arbitration or otherwise * * *."

*and certain policy and rule of action for the guidance of the agency created to administer the law.'* * * *

\* \* \* \* \*

"\* \* \* Some of the standards are rather broad and general while others are most specific *but many statutes containing only a general standard have been held sufficiently definitive.* In Lichter v. United States, 334 U. S. 742, 92 L. Ed. 1694 (1948), Justice Burton, speaking for the Supreme Court, said at page 785 of the U. S. report:

" 'It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program. "If Congress shall lay down by legislative act an intelligible principle \* \* \*, such legislative action is not a forbidden delegation of legislative power." J. W. Hampton, Jr., & Co. v. United States, 276 U. S. 394, 409, 72 L. Ed. 624, 630, 48 S. Ct. 348. \* \* \*' " (Italics supplied.)

Under the principles thus expressed, we cannot hold that § 179.38 is invalid because of its failure to provide adequate standards for guidance of the arbitrators to be selected thereunder.

■ Defendants do not question the act because of the separate classification of charitable as distinct from other hospitals, but such classification is challenged in the brief *amicus curiae.* This challenge appears answered in N. W. Hospital v. Public Building S. E. Union, 208 Minn. 389, 294 N. W. 215, where we recognized a charitable hospital as an institution in a community differing significantly from other enterprises therein operated for profit. There we noted that charitable hospitals were institutions concerned with the well-being of *all* the people within a community and that a person accepting employment therein undertook obligations *to the community* as well as to his employer. There we acknowledged the legislative right to treat labor problems arising in such institutions in a manner different from those arising in enterprises operated for profit.

The fact that injurious consequences to the public might follow a strike or lockout in a noncharitable hospital would not affect the con-

548

stitutionality of the present enactment under the equal-protection clause. As stated in National Labor Rel. Board v. Jones & Laughlin Steel Corp. 301 U. S. 1, 46, 57 S. Ct. 615, 628, 81 L. ed. 893, 917:

"* * * legislative authority, exerted within its proper field, need not embrace all the evils * * * exhibited in activities within the range of legislative power."

The order appealed from is affirmed.
Affirmed.

MR. JUSTICE NELSON took no part in the consideration or decision of this case.