# DOUGLAS M. HEAD, ATTORNEY GENERAL, AND OTHERS v. SPECIAL SCHOOL DISTRICT NO. 1 AND OTHERS.

182 N. W. (2d) 887.

December 9, 1970—Nos. 42734, 42747, 42766, 42852.

*Lindquist & Vennum, Norman L. Newhall,* and *Michael E. Murphy,* for appellant school board.

*Helgesen, Peterson, Engberg & Spector* and *Roger A. Peterson,* for appellant union.

*Oppenheimer, Brown, Wolff, Leach & Foster* and *Richard H. Murray,* for appellant City of Minneapolis Education Association.

*Douglas M. Head,* Attorney General, *Arne L. Schoeller,* Chief Deputy Attorney General, and *John R. Kenefick,* Assistant Solicitor General, for respondent State of Minnesota.

*Earl Isensee, Sr.,* for respondent Davidson and other taxpayers.

*Peter S. Popovich, James E. Knutson,* and *Peterson & Popovich,* for Minnesota School Boards Association, amicus curiae.

NELSON, JUSTICE.

Appeal from an order and judgment of the District Court of Hennepin County permanently enjoining defendant Special School District No. 1 from making payment to striking Minneapolis school teachers pursuant to an agreement for increased wages and benefits negotiated between defendant board of education and defendants Minneapolis Federation of Teachers, Local No. 59, and City of Minneapolis Education Association.

The case arises out of the Minneapolis school teachers' strike of April 1970. The facts have been stipulated to by all parties. Defendant Special School District No. 1 (hereinafter referred to as the school district) is the school district for the city of Minneapolis and, as such, has all the rights, privileges, duties, and obligations of an independent school district as provided for by the laws of the State of Minnesota. Defendant board of education (hereinafter referred to as the board) governs and has the care, management, supervision, conduct, and control of defendant school district. The school district in the school year 1969-1970 employed 3,400 teachers. Most of these teachers belong to one of two associations which represent their interests in negotiations with the board. These associations are defendant Minneapolis Federation of Teachers, Local No. 59 (hereinafter referred to as MFT), a voluntary union of teachers and others employed by the board; and defendant City of Minneapolis Education Association (hereinafter referred to as CMEA), a voluntary association of teachers and others employed by the board.

Defendant school district and its board, in dealing with its teachers, are governed by the so-called "meet and confer law," Minn. St. 125.19 to 125.26. Pursuant to this law, a teachers' council was established in the fall of 1969 consisting of three members of defendant MFT and two members of defendant CMEA to represent the teachers' interests in reaching agreement on "conditions of professional services" between the teachers and

the board for the school year 1970-1971. As defined in § 125.20, subd. 5, conditions of professional services means "economic aspects relating to terms of employment, but does not mean educational policies of the district." Beginning in December 1969, defendant board, through a committee, met with the teachers' council in an effort to reach agreement for the school year 1970-1971 on conditions of professional services. The committee and the teachers' council also exchanged information and expressed views on a wide variety of subjects of interest to the board and its teachers.

Despite extensive negotiations and discussions by the board's committee and the teachers' council, the two were, in February 1970, still over $10 million apart in regard to the teachers' salary schedule for the 1970-1971 school year. Therefore, in accordance with § 125.25, the board, by official action on February 24, 1970, requested the establishment of an adjustment panel, named its representatives to the panel, and notified the teachers' council of its action. The teachers' council chose not to appoint any representative to the adjustment panel or take part in any of its proceedings. Subsequently, the other two members to the adjustment panel were named by the chief judge of the Hennepin County District Court, one of those members being the president of MFT. He did not attend the proceedings or participate in any way in the deliberations or final recommendations of the adjustment panel.

On April 7, 1970, the adjustment panel adopted findings of fact and recommendations, which the board accepted and resolved to put into effect.

On April 6 the members of defendant MFT, by majority vote, determined to absent themselves from work in order to influence conditions of employment. The agreed date on which this was to commence was April 9, 1970.

On April 8 defendant CMEA applied to the board for personal leave on behalf of all its members for April 9 and 10. The board

rescinded and canceled the personal leave policy and notified defendant CMEA of that action.

On April 9 certain members of defendant MFT went on strike against defendant school district and its board. Defendant CMEA determined by majority vote not to join in the strike. Despite this, some of its members did absent themselves from work commencing April 9 and joined the strike. Other CMEA members absented themselves and purported to take personal leave for April 9 and 10. On Thursday, April 9, and Friday, April 10, about 1,200 teachers were at work. Approximately 2,200 were absent from work on those days, and active bannering and picketing took place at all schools.

On April 8 and 9, defendant board obtained temporary restraining orders against defendants MFT and CMEA and their officers, restraining and enjoining them from participating in a strike as defined in Minn. St. 179.51, and also from picketing school property or interfering with the normal operations of the schools. These orders also required the two organizations and their officers to show cause why a temporary injunction in similar language should not be issued. Defendant school district administratively determined that all teachers who absented themselves from work on Friday, April 10, 1970, were "on strike," that the provisions of § 179.54 were applicable, and that these teachers thus had terminated their employment. See, Garavalia v. City of Stillwater, 283 Minn. 335, 168 N. W. (2d) 336. Teachers who were present on April 10 were not treated as being on strike, regardless of whether they were or were not in attendance at their jobs on April 9.

Despite the temporary restraining orders, certain teachers continued on strike and continued to picket and banner throughout the week of April 13 to 17. Under these circumstances, the school administration decided to close the schools due to the possible danger to life and property of the students, teachers, and general public. Thereafter, the schools remained closed by various administrative actions, ratified by defendant board from

time to time, from April 13 until April 29. On April 20 a writ of temporary injunction was issued and served on defendants MFT and CMEA and their officers. Thereafter, until the schools opened on April 29, there was no general picketing of the schools.

From April 13 to April 20, the board's committee met and conferred with the three MFT members of the teachers' council, defendant MFT allegedly excluding defendant CMEA's representatives from the meetings. On April 15 defendant CMEA sued to enjoin the board and MFT from continuing the meetings without the presence of the two CMEA members of the teachers' council. On April 21 the district court issued an order restraining defendants from calling or conducting meetings between the teachers' council and the board of education without first providing notice to all five members and affording each member a full opportunity to attend. By April 20 the board's committee and the MFT members of the teachers' council had worked out exact language to be included in all policy items for adoption by the board. However, on that same day, the board broke off negotiations with the teachers' council because the latter rejected the board's final offer of a salary and fringe schedule. After this announcement of its final offer, the board further announced that it would attempt to reopen the schools shortly. From April 20 on, the board conducted no further negotiations with the teachers' council but did remain in informal contact with the leaders of the two organizations.

After negotiations had broken off, the board on April 21, 1970, mailed to all teachers the final salary offer made to the teachers' council and certain policy language which had been worked out for adoption by the board. On April 22 it mailed to every teacher a request that he advise the board of his intent to return to teaching duties upon the reopening of the schools. Only 1,500 teachers indicated their intent to return to work, and many of these qualified their intent by stating they would return only if they deemed it safe to do so. Because this response was less than one-

half of the full complement of teachers, the board was concerned at the prospect of attempting to reopen the schools.

From discussions with defendant MFT over the weekend of April 25 and 26, the board concluded that the MFT leadership would not recommend that its striking teachers return to work without assurance of reimbursement for money lost through non-payments since April 9 and further assurance that after a year had elapsed they would receive a payment or payments equal to the money lost during the 1970-1971 school year through application of the statutory restriction of Minn. St. 179.55 against their receiving increased pay for services performed within a year following a strike. The board concluded also that no substantial number of MFT teachers would return without the recommendation of their leadership and that many CMEA teachers would fail to return unless assured that the schools would have nearly complete staffing so as to be safe for all concerned.

At this point, the board felt it could not reopen the schools with very limited staff. Also, on April 24 the board was advised by the commissioner of education that its eligibility for state aids was in danger if the schools did not open in the very near future.

Faced with this situation, the board on April 27, 1970, reached agreement with defendant MFT that it would pass three resolutions, two of which are challenged here, in return for favorable action by the leaders of defendants MFT and CMEA recommending that their respective members return to teaching on April 29, 1970. On April 28 the board passed the resolutions and the schools were reopened April 29.

The resolutions are applicable without regard to teacher organization membership. Pursuant to Resolution A, the board re-hired the striking teachers under the provisions of § 179.55 and intends to pay to each of them as part of his or her last paycheck for the school year 1970-1971 an amount equivalent to the difference in pay between what that teacher was paid during the 1970-1971 school year and what he would have been paid during the

school year if he had been employed at the appropriate step and lane of the 1970-1971 salary schedule.

Pursuant to Resolution B, the board paid each of the striking teachers for 7 days during the strike period (April 20 to 24, 27, and 28) an amount equal to their regular compensation.

Plaintiff, the attorney general of the State of Minnesota, then brought this action to determine the legality of Resolutions A and B. In his complaint, he requested declaratory relief and injunctive relief against defendants. Later, on motion, plaintiffs Keith W. Davidson, Katherine V. Howard, Harvey A. Ring, and Betty K. Robb were granted permission to intervene on their own behalf and on behalf of all other taxpayers and residents of Minneapolis. At trial, an agreed stipulation of facts was received into evidence. Based thereon, and the parties' written and oral arguments, the trial court determined that both resolutions were contrary to law. The trial court ordered that a permanent injunction issue prohibiting the school board from paying the compensation provided by the resolutions. The various defendants have appealed from the order and the judgment and injunction entered pursuant to it.

■ The attorney general's standing to commence this action has been questioned. It is clear that the attorney general may commence an action whenever, in his opinion, the interests of the state require it. He possesses such power pursuant to both common law and statute.

As the chief law officer of the state, the attorney general possesses all of the powers inherent in that office at common law. He possesses original discretion which he may exercise in instituting proper proceedings to secure the enforcement of law. The attorney general may institute, conduct, and maintain all such actions and proceedings as he deems necessary for the enforcement of the laws of this state, the preservation of order, and the protection of legal right. Slezak v. Ousdigian, 260 Minn. 303, 110 N. W. (2d) 1.

The attorney general also possesses explicit statutory powers to commence litigation. Minn. St. 8.01 provides in part:

"The attorney general shall appear for the state in all causes in the supreme and federal courts wherein the state is directly interested; also in all civil causes of like nature in the district courts whenever, in his opinion, the interests of the state require it."

The attorney general has therefore exercised his discretion in instituting this lawsuit. It is apparent that he has the power to do so under both common law and statute.

■ The Minnesota public employees "no strike" law, Minn. St. 179.51, was first passed by the 1951 Minnesota Legislature in response to a Minneapolis public employees' strike. The rationale for the "no strike" law is very clearly set forth in the preamble to L. 1951, c. 146, which states that "strikes by public employees are a real danger to the safety and welfare of the general public * * * and constitute a strike against the public itself." The specific provisions of the Public Employees Labor Relations Act in dispute are Minn. St. 179.51, which prohibits strikes by public employees; § 179.54; and § 179.55.

Section 179.54 provides as follows:

"Notwithstanding any other provision of law, any public employee who violates the provisions of sections 179.51 to 179.58 shall thereby abandon and terminate his appointment or employment and shall no longer hold such position, or be entitled to any of the rights or emoluments thereof, except if appointed or reappointed as hereinafter provided."

Section 179.55 provides:

"Notwithstanding any other provision of law, a person knowingly violating the provisions of sections 179.51 to 179.58 may, subsequent to such violation, be appointed, or reappointed, employed or reemployed, as a public employee but only upon the following conditions: (a) his compensation shall in no event ex-

ceed that received by him immediately prior to such violation, (b) the compensation of such person shall not be increased until after the expiration of one year from such appointment or reappointment, employment or reemployment, and (c) the said person shall be on probation for two years with respect to such civil service status, tenure of employment, or contract of employment, as he may have theretofore been entitled."

These statutes have their derivation from New York's Condon-Wadlin Act, § 108 of the New York Civil Service Law, which was repealed in 1967.[1] In fact, practically the same wording is found in the New York law and Minn. St. 179.51, 179.54, and 179.55. The Condon-Wadlin Act provided for the automatic dismissal of striking employees (New York Civil Service Law, § 108, subd. 4) as does § 179.54. The New York act (§ 108, subd. 5) also made provision for rehiring striking employees similar to the requirements of § 179.55, except that under the New York statute any striker subsequently rehired could not receive higher pay for 3 years following the strike (as compared with 1 year under § 179.55) and would remain on probation for 5 years (as compared with 2 years under § 179.55).

The trial court in the case at bar found that certain teachers of the school district were on strike in violation of § 179.51; that this violation constituted automatic abandonment and termination of their employment pursuant to § 179.54 (see, Garavalia v. City of Stillwater, *supra*); and that the provisions of § 179.55 must be followed in the reemployment of such teachers. It concluded that Resolution A and Resolution B violate §§ 179.55 and 179.54 respectively. It also determined that §§ 179.51, 179.54, and 179.55 are constitutional.

In our consideration of whether these statutes are constitutional or not, we start with the principle that a law must be sustained unless unconstitutional beyond a reasonable doubt. Laws are held constitutional if reasonably possible. The power of the

---

[1] Laws of New York 1967, c. 392.

courts to hold the law unconstitutional is exercised only when absolutely necessary, and then, with extreme caution. If the language of the law can be given two constructions, one constitutional and the other unconstitutional, the constitutional one must be adopted, though the unconstitutional construction may be more natural. A law may not be declared unconstitutional merely because the court believes it is bad policy or bad economics. 17 Dunnell, Dig. (3 ed.) § 8931.

There is a presumption in favor of constitutionality. It is presumed that the legislature intended to keep within constitutional limits and enact a constitutional law. See, 17 Dunnell, Dig. (3 ed.) § 8929, and cases therein cited.

Although we have found no case directly in point with the case at bar, generally, when the courts have faced the issue of the constitutionality of statutes similar to §§ 179.51 to 179.58, they have held these statutes to be constitutional.

The Condon-Wadlin Act was before the New York courts many times from 1960 to its subsequent replacement by the Taylor Law in 1967. The validity of the act, constitutional and otherwise, withstood frequent attack. Pruzan v. Board of Education of New York City, 25 Misc. (2d) 945, 209 N. Y. S. (2d) 966, appeal on constitutional ground dismissed, 9 N. Y. (2d) 680, 212 N. Y. S. (2d) 416, 173 N. E. (2d) 237; City of New York v. Social Service Employees Union, 48 Misc. (2d) 820, 266 N. Y. S. (2d) 277, affirmed, 25 App. Div. (2d) 953, 271 N. Y. S. (2d) 585. See, also, Matter of Di Maggio v. Brown, 19 N. Y. (2d) 283, 279 N. Y. S. (2d) 161, 225 N. E. (2d) 871, involving ferryboat officers employed under the New York Civil Service Law. In Board of Education of City of New York v. Shanker, 54 Misc. (2d) 941, 283 N. Y. S. (2d) 548, affirmed, 29 App. Div. (2d) 634, 286 N. Y. S. (2d) 453, an action for criminal contempt brought by plaintiff school board against a teachers' union and its president, the court reiterated the constitutionality of the Condon-Wadlin Act, saying (54 Misc. [2d] 944, 283 N. Y. S. [2d] 553) :

"* * * the constitutionality of this statute has consistently been upheld by our courts * * *." [2]

City of Detroit v. Division 26 of Amalgamated Assn. 332 Mich. 237, 51 N. W. (2d) 228, appeal dismissed, 344 U. S. 805, 73 S. Ct. 37, 97 L. ed. 627, involved a statute similar to Condon-Wadlin, the Hutchinson Act (Public Acts Michigan, 1947, No. 336). Its constitutionality was upheld in a comprehensive opinion by the Supreme Court of Michigan.

 Public employees have no common-law right to strike. It is clearly established common law that a strike by public employees for any purpose is illegal. Kirker v. Moore (S. D. W. Va.) 308 F. Supp. 615; City of San Diego v. American Federation of State, County & Municipal Employees, Local 127, 8 Cal. App. (3d) 308, 87 Cal. Rptr. 258. In Anderson Federation of Teachers, Local 519, v. School, City of Anderson (Ind.) 254 N. E. (2d) 329, the Indiana court held that public employees do not have the right to strike and can only acquire it through legislation.

A search of the authorities discloses that many jurisdictions throughout the United States have held that public employees have no inherent right to strike, particularly when legislative enactments prohibit strikes against a public entity as being unlawful. In Minneapolis Federation of Teachers v. Obermeyer, 275 Minn. 347, 147 N. W. (2d) 358, this court indicated that the activities protected by the First Amendment of the Constitution

---

[2] In several instances after the courts had upheld the Condon-Wadlin Act and found that the public employees were on strike and therefore subject to the automatic termination of employment section of the statute and, if rehired, subject to the statutory restrictions of no increase in compensation and probationary treatment, the legislature stepped in to nullify the law. In the New York transit strike, legislation was passed which removed the above penalties from application to transit workers. In a social workers' strike, legislation was passed which made mandatory a hearing to determine whether the strikers were on strike, and in that way, the automatic termination of employment clause was circumvented.

do not include strikes, stating (275 Minn. 358, 147 N. W. [2d] 366):

"* * * Even in the absence of a statute, we know of no authority which gives a public employee the right to strike. In Norwalk Teachers' Assn. v. Board of Education, 138 Conn. 269, 274, 83 A. (2d) 482, 484, 31 A. L. R. (2d) 1133, 1138, President Franklin D. Roosevelt, who was certainly no enemy of labor unions, is quoted as saying:

" '* * * [A] strike of public employees manifests nothing less than an intent on their part to prevent or obstruct the operations of Government until their demands are satisfied. Such action, looking toward the paralysis of Government by those who have sworn to support it, is unthinkable and intolerable.'

"Nor did repeal of the statute affirming the right to join labor unions or other associations operate to their prejudice. The law in its present posture does not prohibit membership in a labor union. The right of freedom to assemble granted under the First Amendment permits teachers to join unions or associations organized to promote their mutual interest. Obviously, membership in a union which is committed to the use of a strike as a weapon in negotiations with the school board violates the spirit of the law and according to some authorities would justify prohibitory sanctions. Annotation, 31 A. L. R. (2d) 1142, 1159 to 1164."

■ In Fairview Hospital Assn. v. Public Bldg. Service Union, 241 Minn. 523, 64 N. W. (2d) 16, this court considered the issue of whether workers in a charitable hospital have a constitutional right to strike. Although we did not state that public employees have a common-law right to strike, we recognized that labor in the private sector may possess such a right. Clearly, the hospital employees were not public employees but were employees of a nonprofit hospital and, as such, considered private employees. This court said that the legislature may prohibit strikes in any case when the interest of public health, safety, and welfare is involved (241 Minn. 534, 64 N. W. [2d] 24):

"Defendants concede, and the laws appear settled, that there are situations when, in the interest of public health, safety, and welfare, the legislature, acting under its police power, may prohibit strikes in certain fields of endeavor. The validity of legislative action along this line is illustrated by such cases as N. J. Bell Tel. Co. v. Communications Workers, 5 N. J. 354, 75 A. (2d) 721; State v. Traffic Tel. Workers Fed. 142 N. J. Eq. 785, 61 A. (2d) 570; Wisconsin Employ. Rel. Board v. Amalgamated Assn. 257 Wis. 43, 42 N. W. (2d) 471 (reversed on other grounds, 340 U. S. 383, 71 S. Ct. 359, 95 L. ed. 364), involving public utilities. See, also, State v. Traffic Tel. Workers' Fed. 2 N. J. 335, 66 A. (2d) 616, 9 A. L. R. (2d) 854; Local 170 v. Circuit Judge, 322 Mich. 332, 34 N. W. (2d) 71."

The preamble to L. 1951, c. 146, clearly establishes that the legislature considered a strike by public employees, including public school teachers, as a real danger to the safety and welfare of the general public. Therefore, the provisions of §§ 179.51, 179.54, and 179.55 are within the rule quoted above.

This court in Johnson v. State Civil Service Dept. 280 Minn. 61, 157 N. W. (2d) 747, considered the constitutionality of a statute prohibiting a state employee in the classified civil service from filing as a candidate for a compensated public office in view of the First Amendment and the equal protection clause of the Fourteenth Amendment. In holding the statute valid, we said (280 Minn. 65, 157 N. W. [2d] 751):

"It is fundamental that there exists no constitutional right to government employment (Adler v. Board of Education, 342 U. S. 485, 72 S. Ct. 380, 96 L. ed. 517, 27 A. L. R. [2d] 472), and a state may, as a condition of employment, require compliance with any reasonable and nondiscriminatory restriction upon the activities of its employees in the exercise of rights to which state employees as citizens might otherwise be constitutionally entitled."

We also held in Johnson that the equal protection clause does not

prevent the legislature from enacting a statute to prevent a social evil, adding (280 Minn. 68, 157 N. W. [2d] 752):

"* * * The equal protection clause does not command that either all evils of the same kind be eradicated by a statute or none at all. Central Lbr. Co. v. South Dakota, 226 U. S. 157, 33 S. Ct. 66, 57 L. ed. 164."

■ A statutory provision against strikes by public employees was held not in violation of the equal protection clause in City of New York v. De Lury, 23 N. Y. (2d) 175, 295 N. Y. S. (2d) 901, 243 N. E. (2d) 128, appeal dismissed, 394 U. S. 455, 89 S. Ct. 1223, 22 L. ed. (2d) 414. Similar holdings may be found in Zeluck v. Board of Education, City School Dist. of City of New Rochelle, 62 Misc. (2d) 274, 307 N. Y. S. (2d) 329; Rankin v. Shanker, 23 N. Y. (2d) 111, 295 N. Y. S. (2d) 625, 242 N. E. (2d) 802.

It has been held that one's employment by the state is not property and is not protected by the due process clause. This principle has been uniformly recognized by the courts. It has been held on numerous occasions that a public employee has no vested right to his position. For instance, in City of Detroit v. Division 26 of Amalgamated Assn. 332 Mich. 237, 51 N. W. (2d) 228, the Michigan court held that public employment cannot be considered a property right within the meaning of the due process and equal protection clauses of the Constitution.

Civil service status is not a vested right. Employees in the classified service of a city do not have a vested right to their employment. It is firmly established in this state that a state employee, even though under civil service, has no vested right to his position. See, Starkweather v. Blair, 245 Minn. 371, 71 N. W. (2d) 869; Slezak v. Ousdigian, 260 Minn. 303, 110 N. W. (2d) 1.

■ As already stated, the equal protection clause does not grant a right to strike. The provisions of §§ 179.54 and 179.55, discussed in the course of this opinion, are constitutional and applicable herein. Simply stated, as we held in Garavalia v. City of Stillwater, *supra*, once a person violates the provisions of § 179.51, his employment is automatically terminated by

§ 179.54, which states that an employee who has abandoned and thus automatically terminated his employment shall no longer hold that position, or "be entitled to any of the rights or emoluments thereof, except if appointed or reappointed as hereinafter provided." No action by the public employer is required. Thus, no payments or compensation can be made to the striking teachers for the period of nonemployment when they were not employees of the school district. Therefore, Resolution B, which was the agreement by the board to pay the teachers an amount equal to their regular compensation for 7 days when they were on strike, which amount has already been paid, is null and void under the provisions of § 179.54. In effect, the teachers were paid while they were on strike and their employment had automatically terminated. In addition, Resolution B is untenable because it provided pay for work not performed.

Furthermore, it is obvious, as set forth in the trial court's memorandum and respondents' brief, that it is the intent of the legislature pursuant to § 179.55 that no increase in compensation of any kind can be made to an employee who has violated the provision of § 179.51 and been rehired under § 179.55 for a period of one year immediately subsequent to the rehiring. Increased compensation cannot in any way be related to the performance of duties within the period of one year from the date of the rehiring, as is contemplated by Resolution A. Therefore, increased compensation by a lump-sum payment for services rendered during a period of one year after the date of rehiring is contrary to the provisions of § 179.55 and cannot be sustained. If the compensation involved in Resolution A is related to work performed during the 1970-1971 school year, and there is agreement that it is, then it is prohibited by § 179.55.

Since §§ 179.51, 179.54, and 179.55 are constitutional and applicable in all respects to the instant case, the order and judgment of the trial court must be affirmed.

Affirmed.

Mr. Justice Murphy took no part in the consideration or decision of this case.